HARRISON et al. v. ABERCROMBIE.
(No. 7721.)

(Court of Civil Appeals of Texas. Galveston.
May 13, 1919.)

1. BOUNDARIES ⬥37(1)—LAND EMBRACED IN DEED—EVIDENCE.

Finding that description of deed under which plaintiffs claimed embraced land claimed by defendant, adjoining owner, held against preponderance of the evidence.

2. TRESPASS TO TRY TITLE ⬥6(1)—STRENGTH OF PLAINTIFF'S TITLE.

Plaintiff must recover upon strength of her own title, and not upon weakness of defendant's title.

Appeal from District Court, Walker County; E. A. Berry, Judge.

Suit by Mrs. L. A. Abercrombie against Jemimah Harrison and others. Judgment for plaintiff, and defendants appeal. Reversed and remanded.

Dean, Humphrey & Powell, of Huntsville, for appellants.

Hill & Hill, of Huntsville, for appellee.

LANE, J. This suit was brought by Mrs. Abercrombie against Jemimah Harrison, the widow of Arthur Harrison, deceased, and the children of said Arthur Harrison, to recover a certain tract of land, a part of the John Cummings survey in Walker county, Tex., which is described in her petition by metes and bounds as follows:

"Beginning on the bank of Trinity river, opposite A. McDonald's plantation, on a sweet gum 24″ marked E, a sweet gum 18″ bearing S. 81° E. 1 vara; thence south 246 poles to a pond 20 poles wide; thence in said direction 120 poles to a stake, a pine 20″ brs. N. 15° W. 4 varas; thence west to the west line of said league; thence north with the line of said league to the northwest corner of said league; thence with the meanderings of the river to the place of beginning."

Plaintiff's petition is in the ordinary form of petitions in suits of trespass to try title. She also pleaded title to the land described under the five and ten year statutes of limitations.

The defendants answered by disclaimer as to all of the land sued for except that portion thereof described and claimed by them ·

⬥For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

in their answer. They also pleaded not guilty as to the land claimed by them and as to this land they pleaded the 10-year statute of limitation in bar of the plaintiff's right of recovery.

The case was tried by the court without a jury, and judgment was rendered for plaintiff, Mrs. Abercrombie, which said judgment contains, among other recitals, the following:

"It is therefore ordered, adjudged, and decreed by the court the plaintiff Mrs. L. A. Abercrombie, do have and recover of and from defendants, Jemimah Harrison, Oscar Harrison, Robert Harrison, John Harrison, Dan Harrison, James Harrison, Arthur Harrison, Andy Harrison, and Ras Harrison, and Berry Coleman and wife, Octavia Coleman, and Ben Sayles and wife, Marcissus Sayles, all and singular, the following described land, to wit: All that certain tract or parcel of land described as follows, to wit: A part of the Cummings league, beginning on the bank of Trinity river, opposite A. McDonald's plantation, on a sweet gum 24″ marked E, a sweet gum 18″ bearing S. 81° E. 1 vara; thence south 246 poles to a pond 20 poles wide; thence in same direction 120 poles to stake, a pine 20″ brs. N. 16° W. 4 varas; thence west to the west line of said league; thence north with the line of said league to the northwest corner of said league: thence with the meanderings of the river to the place of beginning—containing 460 acres of land more or less.

"And it further appearing to the court that the lands and premises above described cover and include the tract or parcel of land hereinafter described, and that the two said tracts of land are identical, it is therefore ordered, adjudged, and decreed by the court that the plaintiff, Mrs. L. A. Abercrombie, do have and recover of and from the defendants above named, and each of them, said tract of land, to wit: All that certain tract or parcel of land in Walker county, Tex., being a part of the north end of the Jno. H. Cummings headright league, beginning on the south bank of the Trinity river opposite the old A. McDonald plantation, on the divisional line between the east and west halves of said league, a stake for corner; thence S. 7° W. with said divisional line 4,806 feet to a slough 5,028 feet to corner made for the Harris negroes tract, 5,139 feet to south edge of slough, 5,555 feet to slough 140 feet wide, 5,778 feet to slough 222 feet wide, 6,039 feet to mound of rock for corner, from which an elm 16″ bears S. 82½° W. 30½ feet; thence N. 83° W. 3,403 feet to mound of rock in west line of the J. H. Cummings league and the east line of the J. Werner survey, from which a pin oak 10 inches bears N. 83° E. 27 feet, 9 inches; thence north 7° east, with the Werner east boundary line 1,810 feet to south bank of Trinity river; thence down said river with the meanderings thereof to the place of beginning—all bearing trees marked X, and being the same land conveyed to plaintiff herein by G. C. Clegg, on the 19th day of January, 1895, by deed of conveyance of record in volume 7, page 480 et seq., of Deed Records of Walker county, Tex.

"And that all right, title, and interest of defendants in and to said premises as described by each and both of the foregoing descriptions be divested out of them and vested in plaintiff, Mrs. L. A. Abercrombie, and that she have her writ of possession against each and all of said defendants."

From this judgment defendants have appealed.

By assignments 1 to 6, inclusive, which are grouped, appellants in effect insist: First, that the court erred in finding and holding that the description of the land in the deed under which appellee claims, and the description thereof set out in her petition, embraces the land claimed by appellants in their answer, in that such finding is contrary to the great weight and preponderance of the evidence and against the overwhelming preponderance of the evidence; second, that the court erred in not finding that the north line of the tract of land claimed and owned by appellants as set out in their answer was and is the true north line of their land and the true boundary line between the lands of appellants and appellee in that the great weight and preponderance of the evidence and the overwhelming preponderance of the evidence shows that said boundary line is the true boundary line between the lands of appellants and appellee and the true north boundary line of the land of appellants; and, third, that the court erred in finding and holding that the field notes made by J. W. Hall, Jr., set out in the decree of the court, correctly described the land described in the deed under which appellee claims, and in rendering judgment in favor of appellee for the land embraced in such Hall field notes:

"Because the undisputed evidence shows that the survey and field notes made by the said Hall and set forth in this ground of the motion for new trial covered and embraced and does cover and embrace 100 acres or more of the land claimed by these defendants and described in their answer, that the said survey and field notes as made by the said Hall extend south of the north boundary of the land claimed by these defendants so as to include more than 100 acres of land claimed by these defendants, and the great weight and preponderance of the evidence and the overwhelming preponderance of the evidence shows that the south boundary line of the tract of land conveyed by G. C. Clegg to the plaintiff and described in plaintiff's petition herein was an old marked line as far back as 1858, and that the said south boundary line was the same as the north boundary line of the land claimed by these defendants and described in their answer."

The undisputed evidence shows that the John H. Cummings league was divided into two equal parts in 1842 by a line beginning on the southwestern bank of the Trinity river and running thence practically south to its south line; that in arriving at the beginning point on the river the surveyor who established the division line began at the northeast corner of the league, and from there ran up the river to an ash from which a pecan 14 inches in diameter, marked F, bears N. 45° W. 3 varas, and a cottonwood 48 inches.

in diameter, marked F, bears N. 3½° W. 4.5 varas; that the east half of the league was known as the Edward Bailey land, and the west half as the James Powell land; hence the division line was known as the division line between James Powell and Edward Bailey, which is called for as such in some of the field notes which we shall hereinafter discuss.

The undisputed evidence also shows that on the 11th day of February, 1847, James Powell executed and delivered to Jesse Evans a deed, in which it is recited that for $460 he had sold to Jesse Evans—

"a certain tract or parcel of land lying and being situated on the Trinity river in the county and state aforesaid, bounded as follows, to wit: (Being a part of the John H. Cummings headright league.) Commencing on the bank of the Trinity river opposite A. McDonald's plantation on a sweet gum marked F 24", a sweet gum bearing S. 81° E. 18" 1 vara; thence south 246 poles to a pond 20 poles wide; thence in the same direction 120 poles to a stake, a pine N. 15° W. 4 varas 20"; thence west to the west line of said league; thence north with the line of said league to the northwest corner of same; thence with the meanderings of the river to the place of beginning on the aforesaid gum tree; thence east 170 poles to a pin oak marked F, an overcup S. 12° W. 4 varas 15"; thence north on the division line between the said Powell and Edward Bailey to the river corner of said league; thence up the river with its meanders to the same beginning corner on the aforesaid sweet gum—containing by estimation 460 acres."

It also shows that the land thus identically described by mesne conveyances passed to one Jack Thomas, and that in 1883 Jack Thomas conveyed to one G. C. Clegg a tract of land described as follows:

"A part of the Cummings league lying in the county of Walker and state of Texas, and bounded as follows: Beginning on the bank of the Trinity river opposite the A. McDonald plantation on a sweet gum marked E, 24 inches diameter, a sweet gum bearing S. 81° E. 18 in. dia. 1 vara; thence south 246 poles to a pond 20 poles wide; thence in same direction 120 poles a stake a pine brs. N. 15° W. 4 varas, 20 inches dia.; thence west to the west line of said league; thence north with the line of said league to the northwest corner of said league; thence with the meanders of the river to the place of beginning"

—and that thereafter, in the same year, Clegg sold the same land to appellee herein, Mrs. L. A. Abercrombie, and in his deed described the same exactly as described in the deed from Jack Thomas to him.

It is the contention of appellants that the deeds from Powell to Jesse Evans, from the administrator to Jesse Evans to J. Turner Evans, and from J. Turner Evans to Thomas, hereinafter referred to, described and conveyed two separate tracts of land aggregating 460 acres, and that the deeds from Jack Thomas to G. C. Clegg and from Clegg to Mrs. L. A. Abercrombie described and conveyed only the first tract described in the group of deeds first mentioned, and that the second tract described therein was not conveyed to Mrs. Abercrombie by the deed from Clegg to her. They also contend that it is evident from the descriptive calls for the second tract conveyed by the first group of deeds the first descriptive call is omitted, and that from the recitals in the descriptive calls as a whole, and the indisputable evidence, it is made clear that the omitted call should be supplied so as to call to begin at the beginning corner of the first tract and run thence south with the east line of said first tract to its southeast corner; that, if this call is so supplied, the ambiguity and uncertainty existing is removed, and the certainty which is expressed by other language showing the clear and explicit intention of the parties is maintained, and all the descriptive calls in the instruments are made to harmonize minutely with the facts shown to exist and as contended for by appellants; that by supplying this call the south line of the two tracts, and the bearing tree called for by the second call as the southeast corner of the second tract, are shown by the undisputed and indisputable evidence. They also contend that there is no credible evidence which would authorize the trial court to find that all the land embraced in the field notes of Surveyor Hall, set out in the decree, was embraced in the description of the land sued for in appellee's petition or described in the deed from Clegg to appellee.

Appellee contends, on the other hand, that the first group of deeds conveyed only one tract of land containing 460 acres, and that the last three calls, to wit, "thence east 170 poles to a pin oak marked F, an overcup S. 12° W. 4 varas; thence north on the division line between the said Powell and Edward Bailey to the river; and thence up the river with its meanders to the same beginning corner on the aforesaid sweet gum—containing by estimation 460 acres," should be disregarded as surplusage, and that the calls claimed by appellants to be the boundaries of the first tract only did in fact embrace within their limits the 460 acres claimed by appellee; that as a fact the true beginning corner of this one tract was at the same point on the Trinity river as that at which the division line of the league began; that it was not at the gum tree, as claimed by appellants; and that there was sufficient evidence to support the finding of the court that the true lines of appellee's land as described in her deed from Clegg and in her petition were as claimed in the field notes of the survey made by Hall, set out in the decree.

On the 1st and 2d days of October, 1858, one John McCreary by order of court made a survey of a certain tract of land containing

769 acres, sold by Powell to Davy (being the land now owned by appellants). A report made of this survey was introduced in evidence, and shows that in making the survey the surveyor began at the northwest corner of the Wilkins survey, the southeast corner of the Davy tract, and ran S. 82° E. 1,095 varas to Wilkins northeast corner, 1,145 to the division line of the league (made in 1847) for the southeast corner of said Davy tract; thence N. 8° E. 3,750 varas with said division line to an overcup tree marked F, which he took to be the southeast corner of the Thomas tract (now owned by appellee); thence N. 82° W. 1,030 varas on a marked line, which was old when he made the survey in 1858, to stake from which a pine bears N. 15° E. 4 varas, same being the southeast corner of the first tract described in the deed from Evans to Thomas; thence with said old marked line 155 varas to the west line of the Cummings league; thence southwest 3,750 varas with said line to place of beginning. This report also contains these further recitals, to wit:

"The surveys of Wilkins and those of Thomas on the river have been run. I think, without any variation and some of the lines not run at all, the calls in the Thomas survey are not correct according to the lines and courses on the ground; the line at the corner F and extending across the tract being called for to run from the gum corner on the river, which I think may be accounted for from the omission to put in the course from the gum corner to the corner which has the pine for a bearing tree. By putting that course in would include the land intended to be conveyed in the deed from Powell and Jesse Evans by Evans to Thomas. The tract in the plat containing 769 acres is, I believe, the land intended to be conveyed by the deed from Powell to Davy and hath courses and distances as the foregoing plat represents."

Witness J. W. Oliphant, a surveyor, testified that about three years prior to the trial of this cause, at the instance of counsel for appellants, he made a resurvey of some of the old lines of the two tracts of land involved in this suit; that he had the old field notes of lands claimed by the parties, and also of lands contiguous thereto; that he also had a plat and field notes of the survey made by J. M. Hall. He further testified as follows:

"At the northeast corner of the Harrison tract we found an overcup oak about 28 inches in diameter marked with the letter F. This tree bears S. 14° W. 4 varas from a stake which was said to be the northeast corner of the Harrison tract, and a sweet gum 24 inches diameter bears S. 60° E. 10 varas from the same corner stake. The letter F that was on the overcup was very old. Yes, sir; I found a call for it in the old field notes. The main field notes we depended on was a surveyor's report made by John McCreary in 1858, and it went ahead to explain that McCreary had been sent there to establish that line, and that the old field notes called for a pin oak marked F, but he found an overcup oak marked F. We were looking for the overcup oak. Yes, sir; that was the overcup oak we found at the northeast corner of the Harrison tract. No, sir; I did not find any pond on the divisional line as called for in the field notes. There is an old wash or run there, but I did not take it to be a pond, and it is not at the same distance the field notes called for. I run another line west of this divisional line. It was approximately 155 varas east of the west line to the lake. These old field notes described two different tracts of land, and one of them calls to begin at the gum corner and go south 246 poles and then 120 poles. I took McCreary's report, and we figured out this line, and it is well established. One thing that is good evidence there is an old fence row and a post oak which I think was very old. When we measured this off we looked for an old corner, and we were looking for a corner with a pine, and we found what we took to be a stump hole. No, sir; we did not find a gum corner, but we found at the proper distance a large flag pond, and this line runs through the west edge of it, and it is 246 poles from the river bank to it. It was about 300 feet wide. A pole is 16½ feet. It was the correct distance from the river and it was plain a line the other 120 poles from that point. We went to the corner where the overcup was, and then went N. 82° W. Reversing this call, we went east 170 poles, and found there on the divisional line an overcup tree marked F. Yes, sir; this was the divisional line of the league. It is the same line called for in the field notes. We went north to the river with the divisional line. We then went up the river to the beginning point. We got back to the beginning point two different times. On the east line of the first tract from Powell to Evans from the river to the flag pond there was some old field, but no old timber. After we passed the flag pond we found some old timber. It is 170 poles from where we struck the flag pond to where we struck that line. The line running west is marked very plain. I found an old post oak on this line about 14 inches in diameter, and it had some very old marks on it. No, sir; I never computed the acreage in these two surveys of land. We began on the river on a sweet gum which bears S. 81° E. 1 vara; thence S. 246 poles to a pond; then 120 poles to a stake. That line is shown on the plat to be the line running north and south through the tract shown as the Thomas place, and is the line that is shown through the west edge of the flag pond and west of Thomas lake. Then we went west to the west line of said league. That is the line that runs from the southern line first described to the west line of the league. Thence we went north with the line of said league to the northwest corner of said league. This is the west line of the tract described, and is the west line of the original survey. Then we went with the meanderings of the river to the beginning. I do not know how much land there is in the first tract. I have not estimated that. I can get an estimate of whether there is 460 acres in these two tracts. I have not measured the river. (Here witness figured out the land contained in the two tracts to be approximately 460 acres.) When I found that old divisional line of the league, I found an old fence there. Yes; the fence had been there a long time. The fence had some new posts in it

where the old posts had fallen down. Northeast of Thomas lake there is a house that has been there a number of years. Yes, sir; south of the line I made is the Evans graveyard. Yes, sir; there is continuation of the old fence from a point on the east side of the graveyard 300 or 400 yards long. I don't think that the natural presumption would be that with all these improvements there and with the description in the deed from Clegg to Mrs. Abercrombie that this was the east line of the Abercrombie tract. Yes, sir; I worked out the Abercrombie land from the field notes I had. The deed I had was dated back in the '40's. The first deed from James Powell to Evans described two tracts of land. When it gets through it says 'by estimation 460 acres.' No, sir; I don't think that is a perfect description of the two tracts of land. In the deed from Cummings to Jesse Evans dated the 16th day of May, 1850, we have a repetition of the field notes as in the first deed, and it winds up by saying 460 acres of land. When I got the description of the Abercrombie place I looked up all these field notes and that the two tracts of land contained 460 acres. I presumed that there was an error in the Abercrombie tract, and so I got all the old field notes and marked them in different colors. No, sir; when I went there I did not know anything about the physical facts. When I got on the land, I had to recognize these physical facts. Yes, sir; I found the old corner of the Thomas place. I also found the divisional line and run out the 170 poles. Yes, sir; the Swilley deed called for the Thomas place. There was an overcup tree that we found and it is marked. The line is also marked. I had to notice these physical facts."

From the recitals in these conveyances it is clear beyond controversy that James Powell and the successive vendors mentioned above, down to Jack Thomas, by their deeds conveyed two tracts of land out of the west half of the Cummings league. The first tract is described as beginning on the bank of the river opposite the A. McDonald plantation on a sweet gum marked E, 24 inches in diameter, a sweet gum bearing S. 81° E. 1 vara; thence south 366 poles to a stake from which a pine 20 inches in diameter bears N. 15° W. 4 varas; thence west to the west line of the Cummings league; thence north with said line to the northwest corner of said league, on the bank of the river; thence down the river with its meanders to place of beginning. There is, however, some ambiguity in the description of the other tract. The field notes call for it to run east from the beginning corner of the first tract 170 poles to a pin oak marked F, also an overcup S. 12° W. 4 varas; thence north with the division line between the Powell and Edward Bailey half league surveys to the river; thence up the river with its meanders to place of beginning. From these calls we know that the east boundary line of this tract is 170 poles east of the beginning corner and east line of the first tract. We also know that in running the first call the line running 170 poles east intersects the division line between the

Powell and Bailey some distance south of the river, because the second call calls for and is run with said division line to the river. We also know that this second call would lead to the identical point on the river where the surveyor began his line when he divided the Cummings league into the east and west halves, and which he identified as being at an ash from which a pecan 14 inches in diameter marked F bears N. 45° W. 3 varas, and a cottonwood 48 inches in diameter marked F bears N. 3½° W. 4.5 varas. We know that this point is 170 poles east of the beginning corner of the first tract and identified by different kinds of marked trees. We know that from this point we must run up the river with its meanders to get back to the beginning corner of the first tract. We know that the south line of the second tract runs at right angles from the east line of the first tract for a distance of 170 poles; that at this distance it intersects the division line between the Powell and Bailey, and from thence it runs north parallel with the east line of the first Thomas tract to the river, at a distance of 170 poles therefrom. It is evident that the south line of the second tract began at some point on the east line of the first tract other than the beginning corner. We know that the point where the line which runs east 170 poles at right angles from the east line of the first tract to a connection with the division line of the league was designated by the surveyor who first surveyed and marked the boundaries of the two tracts comprising the Thomas tract, by calling for an oak tree marked F. We know that the beginning point of the first tract conveyed to Thomas was designated by the same surveyor by calling for two sweet gum trees, and that the east line of this tract ran south 246 poles to a pond 20 poles wide, and from this point it ran 120 poles south to a point for its southeast corner from which a pine bears N. 15° W. 4 varas. We know that the beginning point of the division line of the league at which Hall began his survey was not marked by the surveyor who established that line by reference to gum trees, but that said survey calls to begin at an ash tree. The report of McCreary shows that in 1858 he found the pine tree called for at the southeast corner of the first Thomas tract on the line contended for by appellants; that at a distance of about 170 poles from the last-mentioned corner he found an oak on the division line of the league. J. W. Oliphant testified that he found one of the gum trees at the beginning corner of said first tract, and that at the distance south called for by the old field notes he found a pond about 20 poles wide, and at the proper distance and place for the pine tree marked by the original surveyor of this tract for its southeast corner he found a stump hole. The undisputed evidence shows that John Thomas, Sr., did at one time own 250 acres

of land, more or less, lying south of the 460 acres claimed by appellee, which 250 acres is a part of the land now claimed by appellants. The title to this 250 acres passed to Jack Thomas. But it is clearly shown, we think, that when Jack Thomas made a sale to G. C. Clegg, he did not sell the two tracts hereinbefore referred to as the Thomas tracts, containing an aggregate of 460 acres, and the above-mentioned 250 acres. He probably undertook to convey both of the Thomas tracts, containing 460 acres, but he did in fact, as shown by his deed to Clegg and by the indisputable evidence, convey only the one tract hereinbefore referred to as the first tract. Appellee claims under a deed from G. C. Clegg, which conveys only such land as was conveyed to him by Thomas. The appellants claim under a deed from W. E. Swilley, who conveyed to them what is known in the record as the Davy 753-acre tract.

To support the finding of the trial court and the judgment in favor of appellee, upon the question as to the true location of the division line between the lands of the litigants, that is, the south line of appellee's land, appellee presents the testimony of L. A. Abercrombie, J. M. Hall, and John Thomas.

We will not discuss the testimony of L. A. Abercrombie, as it is evident therefrom that he does not pretend to know or testify as to where the south line of appellee's land was located by the surveyor who made the survey of the two Thomas tracts which she claims.

The effect of Hall's testimony is that he procured the field notes in the deed from James Powell to Evans, executed in 1847, and undertook therefrom to locate the east and south lines of the land sought to be described in said deed; that he began his survey at a point on the bank of the Trinity river opposite the A. McDonald house on the other side of the river, from which point a well-marked line ran south; that he did not know whether this line was the division line of the Cummings league or not, but it was marked by very old marks; that he accepted his beginning point as the beginning point called for in the deed he had, which is described as a point on the bank of the river opposite A. McDonald's plantation on a sweet gum marked E 24″, a sweet gum bears S. 81° E. 18″ 1 vara; that he found neither of the gum trees called for; and that in running south he did not find the pond called for on this line, nor the pine called for as the southeast corner. He testified as respects the objects called for on this east line that he did not find them; that he found no pond on the east line which he surveyed; that he did find a slough on this line at a distance of 305 poles from his beginning point, but not a pond; that this slough was about 61 poles wide; that he ran the distance south called for, to wit, 366 poles, or 6,039 feet, for a corner; that he found no marked trees at this corner; that he did not run the south line but a short distance; that he found some old marked trees on this south line; that he did not look for the oak tree marked F on the east line claimed by appellants as their northeast corner; that there is nothing on the east line he ran between the river and slough that could be called a pond; that it is all level ground from the river to the slough.

The witness John Thomas testified as follows:

"My name is John Thomas. Old man Jack Thomas was my uncle. The last Jack Thomas was my cousin. Yes, sir; this land in controversy here got its name from Uncle Jack Thomas. He bought the land from J. Turner Evans. I have known this place ever since 1854. I was raised on this place. I was on the place off and on from 1854 until 1877. I have never lived on it since the year 1877, but I have known the place all the time since 1877. I would go down there every spring and fix up the graves of the old Thomas graveyard. Yes, sir; I know the lines on this Thomas land. I was present with J. M. Hall and Sam Roark when they made the survey last year. I helped them all I could. I know where the northeast corner of the tract is. Mr. Hall said that he could not find the original corner tree, and I started him off from the McDonald place across the river. The corner was on a sweet gum tree, and our fence used to corner right there. We cut the trees when we made a water gap there. The point I took Mr. Hall to was the old McDonald corner. The house was just across the river. There was a big cottonwood that stood on the line, but it had fell down when we made this survey. That old cottonwood tree was one of the original line trees. The river bank has caved in a great deal since I knew this place. The old corner tree would stand about 25 or 30 feet out in the river at this time. My recollection is that the old gum tree stood where the river is now. It would be down under the hill or the bank of the river now. When Mr. Hall got his starting point he then run south. As far as I know, the line that he run was the line of the Thomas place. I never knew any other fence. We had our fence on the line just opposite the big lake. Yes, sir; we had our fence on the line that Hall marked out. The sign of the old fence was still there. Uncle Jack had the fence put there some time in 1859 or 1860. In going south on that line we come to a slough which was known as Horseshoe slough. I pointed out the southeast corner to Mr. Hall. The corner I pointed out to him is the corner of the survey. In my judgment the place I pointed out to him was the old corner. Then we went west on the south line. I know this line well. The line Hall run was the same line. When we got to the southwest corner, I was not able to point that out to him. I knew the beginning point, the southeast corner and the south line, and know that these were the lines that had been claimed ever since I knew the property. My uncle had about 300 acres in cultivation on this place. Yes, sir; I know where the old Evans graveyard is. My uncle's improvements extended as far as the farm goes now on that side to the end of the big lake. I

don't know how near it went to the south line. It went south of the graveyard. Yes, sir; I am familiar with this map. Yes, sir; some of the Harrison negroes were with us when we made the survey. No, sir; they did not point out to any one their corner that I know of. No, sir; there is no corner on the south bank of the slough, and there was none there when I knew this land. No, sir; there was never any dispute as to the location of the south line. No one ever claimed the line that the Harrison negroes claim up until 1877. Yes, sir; these negroes showed me the line that Smith had run for them. They had a wire fence there. Yes, sir; this fence was north of the graveyard. A man by the name of Swilley lived on the Evans place. I lived there after he did. My father went there in 1854, and he improved the place in 1860. South of our house our improvements extended as far as the hollow; I suppose about 100 yards or more. The house was south of the graveyard. It was about 50 yards south of the graveyard. People were buried there in the year 1877."

"The northeast corner of my uncle's place was marked on a sweet gum and a pecan. I don't know whether this is the same as the northeast corner of the west half of the Cummings league. I was very small when they divided this land. I am 65 years old now. I was raised on that farm. I was there until 1877, and have not lived there since. I have been on the east line since 1877. I was there in 1909. I went around the field. I was with John Roark. I had some horses in the pasture at the time. As well as I remember, the southeast corner of the John Thomas 460 acres was marked on a post oak. The pine trees were the bearing trees. I cannot say exactly how far the pine tree was from the post oak corner. One of the pine trees was just east of it, and the other south of it. I never did measure just how far. Yes, to the best of my belief, they were post oak and pine trees. I had an interest in this land. I don't remember who I went around the place with in 1877. I have not been back on the place except to go to the graveyard. We lost the place in 1882 in the district court of this county. Jack Thomas brought a suit in the district court against the Leroy Thomas heirs. Jack Thomas was a nephew of John Thomas. He was a son of Bud Thomas. I don't know when Arthur Harrison bought the Swilley tract. I think he bought it after the lawsuit. I was back there in 1881 looking after the place. Vann had it leased from us. There was a suit between the Vanns and the Thomases. No, sir; we could not find any marks at the southeast corner, but we found old marks on the east line. We never found any mark for the southeast corner. There were some holes there where some trees had been. We did not find any marks for the southeast corner, but I know it well enough to identify it. I had not been at this corner for about 41 years. When we got down to where Mr. Hall made the corner, we could not find any marks. The old line was on the east. We found old hacks all the way down the east line. There were several different kinds of trees that we found while going down the south line of it. There was a pin oak that I remember. This was a good piece from the southeast corner. We found an old pine on the south line that we thought might be a landmark. I know we found marks on the east line.

When we owned the land we rendered 400 acres, but our deed called for 460 acres. There is no pond on the east line. There has never been since I have known it. There was a slough on it. Some called it a pond. We called it Horseshoe Lake. It is 200 or 300 yards from Thomas Lake. It is east of it. It is wider at times. The water runs out of it when it rains. There is a pond north of the lake. It is a pretty big pond. It has been there always. It is about 300 feet wide. It is three or four times larger than the pond I spoke of on the east line. One of the old houses was built in 1865, and the other was built in 1856. I was not on the place at that time. I was 4 years old then. The McDonald place was a big farm during slavery time, and it run up the river toward Newport. It went around the first bend of the river, but not around the second one. It did not extend any piece further west than the west line of our 460-acre tract. It was north. It was a mile further west. Our line hit the river a mile above the McDonald farm. The McDonald house was just across the river from our farm. It was northeast of our house. I do not remember how the northwest corner of our tract was marked. The southwest corner was on the bank of the river. I don't know exactly how it was marked. I know the southeast corner. The southwest corner was on a rock hill, and I think there was a black-jack there. I don't know what kind of a tree was at the corner. I think it was a stake there. No; I never located the corner. I cannot say that I remember that Jack Thomas sued Evans and others, and that the court fixed the south line of the land in controversy as the line which the defendants now claim. I knew Col. McCreary. I do not know when he surveyed this line."

"Yes, sir; I know where the northeast corner was. I know the southeast corner was south of the slough. It is rocky country just before you get to the corner. Yes, sir; I can say that the southeast corner was where I located it. On the west and the southwest corner the country is broken. There is no lake between Horseshoe Lake and the line. I was down on this place in 1909. I had some horses in there. I was on the south part of the land at that time. I was next to the old fence. I don't think the negroes had joined to the old fence in 1909. I did not notice all of the south line when I was there in 1909. I don't know that it extended over on the Harrison negroes 700-acre tract. I don't know how far north their field extended. Yes, sir; if there had been any field next to the old fence, I would have seen it. The little field I spoke of and which I saw last year was never claimed by Swilley as long as I stayed there. It was known as a part of the Thomas tract."

It is evident from the evidence as a whole, including the three maps or plats of the land involved in evidence in this cause, made by three several surveyors, that Surveyor Hall began his survey at a different point on the river from that described in the field notes in the deed from James Powell to Evans, and that this point at which he began his survey was much further south than was the beginning point named in said deed at which he supposed he began.

We are also pursuaded that the testimony

of the witness Thomas relates more to his knowledge and recollection as to where his uncle had his fences than to his knowledge as to the true location of the south line of the 460 acres conveyed to him by Evans.

[1] We have reached the conclusion from the foregoing evidence and all the evidence that the finding of the court that the Hall field notes set out in the decree represents the true boundaries of the land sued for by appellee and described in the deed from G. C. Clegg to her is so manifestly against the great weight and preponderance of the evidence that the judgment rendered · upon such findings should not be permitted to stand.

We think that the overwhelming weight of the evidence shows the line in dispute to be where it is contended for by appellants.

[2] It may be that by the deed from W. E. Swilley to Arthur Harrison, the deceased husband of Jemimah Harrison, and the ancestor of the other defendants, he did not get a record title to the 250 acres lying immediately south of the 460 acres claimed by appellee, and that the record title thereto remains in Thomas; nevertheless he went into possession of the larger portion, if not all of it, and he and those claiming under him had continued such possession up to the date of this suit, and, since appellee is the plaintiff, she must recover, if at all, upon the strength of her own title, and not upon the weakness of defendant's title.

From the field notes in the deeds from Jack Thomas to Clegg and from Clegg to appellee, Mrs. Abercrombie, and from the overwhelming weight of the evidence, we conclude that the deed from Clegg to appellee does not convey to her the second Thomas tract, but that it only conveyed to her the first of said tracts, and consequently she cannot recover any land south of the second Thomas tract by virtue of her deed from Clegg to her. If she is permitted to recover any part of the land claimed by appellants south of the second Thomas tract, she must recover under her plea of title under the ten-year statute of limitation.

We also conclude that the judgment in favor of appellee cannot be sustained upon her plea of limitation and the evidence in support thereof. While the evidence offered may be sufficient to support her claim of title, under the ten-year statute of limitation pleaded, to certain lands not embraced within the boundaries of the two tracts composing the 460 acres claimed by her, there is no description of any land sought to be held by limitation outside or south of said boundaries.

We have already indicated, by what has been hereinbefore said, that the only land described in appellee's petition is the tract which we have herein designated as the first Thomas tract; in other words, the western tract of the two composing the 460 acres which passed by mesne conveyances from James Powell to Jack Thomas.

We cannot sustain the contention of appellants that judgment should have been rendered for them under their plea of limitation. There is no evidence showing what portion of the land in dispute had been in their exclusive and adverse possession, if any, so as to identify it, and therefore no judgment for any specific land could have been rendered for them under their plea.

For the reasons indicated above, the judgment of the trial court is reversed, and the cause remanded.

Reversed and remanded.